Antonio **HESTER**, Plaintiff,

v.

**DISTRICT OF COLUMBIA,**
et al., Defendants.

**Civil Action No. 04–1291 (GK).**

United States District Court,
District of Columbia.

May 9, 2006.

---

Joseph B. Tulman, University of DC David A. Clarke School of Law, Washington, DC, for Plaintiff.

Maria L. Merkowitz, Office of the Attorney General for the District of Columbia, Washington, DC, for Defendants.

### *MEMORANDUM OPINION*

KESSLER, District Judge.

Plaintiff, Antonio Hester, brings this suit alleging that Defendants, the District of Columbia and Robert C. Rice, Superintendent of the District of Columbia Public Schools, failed to provide him with a free appropriate public education ("FAPE") as required under the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. §§ 14, *et seq.* This matter is before the Court on Plaintiff's Motion for Summary Judgment, [# 14], and Defendants' Cross–Motion for Summary Judgment, [# 16]. Upon consideration of the Motions, Oppositions, and Replies, and the entire record herein, and for the reasons stated below, Plaintiff's Motion is **granted**, and Defendants' Motion is **denied.**

1. It is unclear from the record whether Hester has been released from MCTC.

2. Although for some reason the parties did not provide the Court with the agreement

## I. BACKGROUND

Plaintiff, Antonio Hester, is classified as "Learning Disabled with emotional concerns" and qualifies for a free appropriate public education ("FAPE") under the IDEA. On May 10, 2000, District of Columbia Public Schools ("DCPS") developed an Individual Education Program ("IEP") for him, which required that he receive "group therapy for forty-five minutes once a week; individual therapy thirty minutes once a week; speech therapy thirty minutes twice a week; as well as supplementary aids and transition services." Administrative Record ("AR") at 60; Pl.'s St. of Material Facts at ¶ 2. Hester was then sixteen years old.

On April 19, 2001, Hester pleaded guilty to two charges in Prince George's County, Maryland, and was incarcerated at the Maryland Correctional Training Center ("MCTC"). *Id.* at ¶ 3. He was sentenced to a maximum of ten years, and was first eligible for parole in August 2005.[1]

On May 31, 2001, while Hester was at MCTC, a due process hearing was held on his behalf to address his claim that he had been denied FAPE. *Id.* at ¶ 4. Prior to the hearing, the parties notified the Hearing Officer that they had reached an agreement whereby DCPS agreed to provide Hester with compensatory education services for the denial of FAPE leading to the hearing, effective November 1, 2000 "until the day before he starts to receive educational benefit."[2] AR at 64.

On June 7, 2001, a Hearing Officer Determination ("HOD") was issued ("2001 Consent Order and HOD"). The 2001

itself, they do not dispute the relevant terms of the agreement for purposes of these Cross Motions.

Consent Order and HOD found that the parties' prior agreement was appropriate, and incorporated the precise terms of their agreement into his Order. It further found that Certified Learning Center ("CLC") was an appropriate provider of Hester's educational services during his incarceration in Maryland. *Id.* at 65. The Hearing Officer ordered DCPS to implement the Special Education Services Plan outlined in his Order.

Pursuant to that plan, CLC was required to implement Hester's 2000–2001 IEP for 90 days; prior to the end of the 90–day period, CLC was to hold an IEP meeting at which appropriate evaluations would be decided upon, among other things. DCPS was given 30 days to perform all necessary evaluations, and within 30 days of the conclusion of the evaluations, a new, appropriate IEP was to be developed for Hester. *Id.* Finally, the Hearing Officer ordered that the "form and quantity of compensatory education for the period November 2000 to the date that Antonio starts receiving educational benefit through CLC is to be determined by the IEP team." *Id.* at 64. DCPS did not appeal this Consent Order.

Following the issuance of the 2001 Consent Order and HOD, CLC representatives attempted to gain access to Hester at MCTC in order to provide him with the requisite educational services. Pl.'s St. of Facts at ¶ 9; AR at 4. However, MCTC refused access to CLC and instead indicated that MCTC itself would provide Hester's educational services. Plaintiff, his legal representative, and CLC attempted to have DCPS resolve the situation, but DCPS took the position that "there is

nothing [it] can do to, [sic] ensure that Antonio receives his educational services while incarcerated in another State [sic]." Att. 2 to Pls.' Reply.

On July 17, 2001, while Hester was at MCTC, an IEP team from MCTC met and decided to implement Plaintiff's May 2000 IEP on an interim basis until it could reconvene. AR at 84. That MCTC IEP team met again on November 13, 2001, November 13, 2002, and a date in October 2003 to conduct annual reviews and update Hester's IEP. Hester was present at these meetings.

In January 2004, Plaintiff requested a due process hearing to challenge DCPS's failure to provide him with FAPE as required by the 2001 Consent Order and HOD. On March 31, 2004, the Hearing Officer[3] issued an HOD in favor of Defendants.[4] The Hearing Officer did not address the central issue of whether DCPS failed to comply with the 2001 Consent Order and HOD. Instead, the Hearing Officer accepted Defendants' argument that Hester, after having been incarcerated in Maryland for over three years, was a resident of Maryland, and not the District of Columbia. As such, the Hearing Officer determined that he was unable to order MCTC to do anything with respect to the educational services due Hester. He further concluded that Hester had been provided educational benefit by the MCTC authorities. Plaintiff filed a Motion to Reconsider, which was denied by the Hearing Officer's Determination issued on July 19, 2004. Plaintiff seeks review of these decisions.

---

**3.** The same Hearing Officer, David Smith, presided over all the hearings.

**4.** Plaintiff refers to a March 31, 2004 HOD in its Motion, but neither the Administrative Record nor its index includes an HOD bear-

ing this date. The HOD the parties cite to is dated July 19, 2004, so it appears the Hearing Officer may have reissued a prior HOD with his denial of Plaintiff's Motion for Reconsideration.

## II. Standard of Review

Summary judgment will be granted when the pleadings, depositions, answers to interrogatories and admissions on file, together with any affidavits or declarations, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. *See* Fed.R.Civ.P. 56(c). A fact is "material" if it might affect the outcome of the action under the governing law. *Anderson v. Liberty Lobby, Inc.* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

The party seeking summary judgment bears the initial burden of demonstrating the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The nonmoving party then must "go beyond the pleadings and by [its] own affidavits, or by depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Id.* at 324, 106 S.Ct. 2548 (internal quotations omitted). *See Laningham v. U.S. Navy,* 813 F.2d 1236, 1242 (D.C.Cir.1987) (nonmoving party has affirmative duty "to provide evidence that would permit a reasonable jury to find" in its favor).

In deciding a motion for summary judgment, "the court must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence." *Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 150, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000). Ultimately, the court must determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Liberty Lobby,* 477 U.S. at 251–52, 106 S.Ct. 2505.

## III. Analysis

Congress enacted the IDEA to ensure that children with disabilities have access to "a free appropriate public education that emphasizes special education and related services designed to meet their unique needs and prepare them for employment and independent living." 20 U.S.C. § 1400(d)(1)(A) (2005). School districts must ensure that "all children with disabilities residing in the State ... who are in need of special education and related services" are identified. *Branham v. Gov't of the District of Columbia,* 427 F.3d 7, 8 (D.C.Cir.2005) (citing *Reid v. District of Columbia,* 401 F.3d 516 (D.C.Cir.2005)). Once such children are identified, a " 'team' including the child's parents and select teachers, as well as a representative of the local educational agency with knowledge about the school's resources and curriculum, develops an 'individualized education program,' or 'IEP,' for the child." *Branham,* 427 F.3d at 8. "[T]he IEP must, at a minimum, 'provid[e] personalized instruction with sufficient support services to permit the child to benefit educationally from that instruction.'" *Id.* (citing *Board of Educ. Hendrick Hudson Central School Dist. v. Rowley,* 458 U.S. 176, 203, 102 S.Ct. 3034, 73 L.Ed.2d 690 (1982)).

State and local educational agencies receiving federal assistance under the IDEA must institute procedural safeguards, 20 U.S.C. § 1415(a), including providing parents of a disabled child "an opportunity to present complaints with respect to any matter relating to the identification, evaluation, or educational placement" of their child, *id.* § 1415(b)(6). After parents make such a complaint, they are entitled to "an impartial due process hearing" conducted by the agency, *id.* § 1415(f)(1). "Any party aggrieved by the findings and decision made" in the due process hearing can bring a civil action in either state or

federal court to obtain "appropriate" relief. *Id.* § 1415(i)(2)(A)-(B).

 "The burden of proof in an administrative hearing challenging an IEP is properly placed upon the party seeking relief." *Schaffer ex rel. Schaffer v. Weast,* — U.S. —, —, 126 S.Ct. 528, 536, 163 L.Ed.2d 387 (U.S.2005). The party challenging a hearing officer's decision in federal court, likewise carries the burden of proof. *Angevine v. Smith,* 959 F.2d 292, 295 (D.C.Cir.1992); *Kerkam v. McKenzie,* 862 F.2d 884, 887 (D.C.Cir.1988). The court may make an independent determination but "it must also give 'due weight' to the administrative proceeding and afford some deference to the expertise of the hearing officer and school officials responsible for the child's education." *Lyons v. Smith,* 829 F.Supp. 414, 418 (D.D.C.1993). In other words, a claim brought under the IDEA is "by no means an invitation to the courts to substitute their own notions of sound educational policy for those of the school authorities which they review." *Rowley,* 458 U.S. at 206, 102 S.Ct. 3034. The court employs a "preponderance of the evidence" standard of review, and may grant relief as it deems appropriate. 20 U.S.C. § 1415(i)(2)(c).

## A. Defendants Failed to Adhere to the 2001 Consent Order and HOD

██ Plaintiff argues that DCPS breached the agreement it entered into with Plaintiff and therefore failed to provide him FAPE, as required by the IDEA. The agreement, entered into when all parties knew that Hester would be incarcerated at MCTC, provided that DCPS would provide compensatory education to Hester beginning November 1, 2000, until the day before Hester began receiving educational benefit by CLC. Foreseeing that

MCTC might not permit CLC to enter the facility to provide educational services to Hester, the parties agreed that the educational services could be provided in the form of compensatory education after Hester's release.[5] Pl.'s Mot. at 10 and n. 8. As this agreement was fully and explicitly incorporated into the Hearing Officer's Determination of June 7, 2001, it must be construed as a consent decree or consent order with respect to those terms agreed upon by the parties. *See Abraham v. District of Columbia,* 338 F.Supp.2d 113, 120 (D.D.C.2004) (noting that a settlement agreement incorporated into a hearing officer's determination as a final administrative decision is "analogous to a consent decree in a civil action").

The Supreme Court has explained that "[c]onsent decrees are entered into by parties to a case after careful negotiation has produced agreement on the precise terms. The parties waive their right to litigate the issues involved in the case and thus save themselves the time, expense, and inevitable risk of litigation." *United States v. Armour & Co.,* 402 U.S. 673, 681, 91 S.Ct. 1752, 29 L.Ed.2d 256 (1971). Consequently, "the scope of a consent decree must be discerned within its four corners, and not by reference to what might satisfy the purposes of one of the parties to it . . . the instrument must be construed as written, and not as it might have been written had the plaintiff established his factual claims and legal theories in litigation." *Id.* at 682, 91 S.Ct. 1752; *see also United States v. ITT Cont'l Baking Co.,* 420 U.S. 223, 236–37, 95 S.Ct. 926, 43 L.Ed.2d 148 (1975) (". . . since consent decrees and orders have many of the attributes of ordinary contracts, they should be construed basically as contracts, without reference to the legislation the Government originally sought to enforce but never proved appli-

---

**5.** Defendants do not dispute this factual asser- tion.

cable through litigation."). In construing a consent decree, a court may rely on aids such as "the circumstances surrounding the formation of the consent order, any technical meaning words may have had to the parties, and any other documents expressly incorporated in the decree." *Id.* at 238, 95 S.Ct. 926; *see also United States v. Microsoft Corp.,* 147 F.3d 935, 946 (D.C.Cir.1998).

Defendants do not dispute the fact that they entered into an agreement with Plaintiff which provided that DCPS would provide Hester compensatory education from November 1, 2000 until the day before Hester began receiving educational benefit. Neither do they dispute that the incorporation of that agreement into the 2001 HOD resulted in the formation of a consent order. Instead, Defendants argue that the 2001 Consent Order and HOD should not be followed because Hester is not entitled to compensatory education and because compliance with the 2001 Consent Order and HOD was impossible. These arguments are unpersuasive.

First, Defendants argue that "[c]ompensatory education is an equitable remedy which is only to be awarded as a form of relief when FAPE has been denied." Defs.' Cross Mot. at 13. They argue that since there has been no determination that FAPE has been denied, Plaintiff's Motion should be denied. However, Defendants' voluntary entry into the 2001 Consent Order and HOD, which provided for the provision of compensatory education, clearly indicates that it was premised on a determination that Hester met the statutory

requirement of denial of FAPE. Otherwise, Defendants could not have consented to the provision of compensatory education. Moreover, any such objection to the lack of an explicit finding about denial of FAPE was waived by agreeing to the Consent Order.

In addition, the cases Defendants cite simply do not support their assertion.[6] *See, e.g., Harris v. District of Columbia,* 1992 WL 205103, at *3 (D.D.C. Aug.6, 1992); *Mrs. C. v. Wheaton,* 916 F.2d 69 (2d Cir.1990). None of the cases involved a binding contract and/or consent order pursuant to which the school system had agreed, considering the facts and circumstances of the case, that the plaintiff was entitled to compensatory education.[7]

Second, Defendants also argue that any duty to perform under the settlement agreement should be discharged because "[i]t is well settled that when due to circumstances beyond the control of the parties the performance of the contract is rendered impossible, the party failing to perform is exonerated." Defs.' Cross Mot. at 15 (citing *Whelan v. Griffith Consumers Co.,* 170 A.2d 229, 230 (D.C.1961)). Defendants argue that since MCTC would not allow CLC entrance into the facility, the situation was beyond their control, and they could no longer comply with the 2001 Consent Order and HOD.

Yet Defendants do not dispute that they entered into the agreement knowing that Hester would be incarcerated at MCTC, and that when the Consent Order was entered, Hester was already there. Pl.'s

**6.** The Court notes that one of the cases cited by Defendants *Burr v. Ambach,* 863 F.2d 1071 (2d Cir.1988), was vacated by *Sobol v. Burr,* 492 U.S. 902, 109 S.Ct. 3209, 106 L.Ed.2d 560 (1989).

**7.** On the record before it, the Court is unable to discern exactly how it was determined that

Hester was entitled to compensatory education. That fact is irrelevant, however, as Defendants do not dispute that they entered into the agreement to provide such a remedy, or that the agreement was subsequently entered as a consent order.

Mot. at 12. Defendants also do not dispute that in negotiating the terms of the agreement, the parties acknowledged that MCTC might not allow an outside provider of educational services to enter the facility, and that if that were the case, CLC would provide the compensatory education only *after* Hester was released from MCTC. Pl.'s Reply at 4. Defendants simply fail to respond to Plaintiff's arguments on these points, and therefore concede their validity. *See* Local Rule 7.1(b); *FDIC v. Bender,* 127 F.3d 58, 67–68 (D.C.Cir.1997).

Defendants' arguments as to impossibility must be rejected for the following reasons: the plain language of the agreement between the parties; the fact that at the time the agreement was entered into Defendants were well aware Hester would be incarcerated in Maryland for at least several years; and the failure of Defendants to respond to Plaintiff's argument that the settlement agreement, foreseeing the possibility that MCTC might not allow CLC into its facility, provided that if that situation occurred Hester would receive compensatory education after his release. Accordingly, Defendants must be held to the terms of the 2001 Consent Order and HOD which they voluntarily negotiated.

## B. The Hearing Officer Erred in Determining that Hester Was Not a District of Columbia Resident

At the 2004 due process hearing, Plaintiffs sought enforcement of the 2001 Consent Order and HOD and a declaration by the Hearing Officer as to the amount of compensatory education owed to Hester. However, the Hearing Officer focused on a different issue argued by Defendants—whether by virtue of his incarceration in Maryland, Hester lost his status as a District of Columbia resident. The Hearing Officer accepted Defendants' argument and concluded:

> Counsel for both parties submitted legal authority in support of their respective positions regarding residency, but the fact of the matter is the student is where he is [in Maryland], has been there for three years and will be there a few years more. The Hearing Officer does not find the legal authority cited by the student's representatives convincing that this student is a resident of the District of Columbia. . . .

*Id.* Therefore, in his view, under 20 U.S.C. § 1412(a)(1)(A)[8], the District of Columbia was not required to provide the educational services required under the IDEA or the 2001 Consent Order and HOD.

■ The Hearing Officer's conclusion was erroneous as a matter of law.[9] A person's residency does not change by virtue of being incarcerated in another state. *Lawrence v. District of Columbia Bd. of Ethics,* 611 A.2d 529 (D.C.1992) ("Many years ago, we established that, in a general sense, a 'residence must be a fixed and permanent abode or dwelling place for the time being and not a mere temporary locality of existence.' . . . Inherent in the concept are the expectation and likelihood of absences, perhaps of some duration, from 'this fixed and permanent abode,' and

---

8. That section provides: "A free appropriate public education is available to all children with disabilities residing in the State between the ages of 3 and 21, inclusive, including children with disabilities who have been suspended or expelled from school."

9. The IDEA does not define the term "resident." There seems to be no disagreement, however, that residency determinations under the IDEA should be made according to state law. *J.S. v. Shoreline Sch. Dist.,* 220 F.Supp.2d 1175, 1191–92 (W.D.Wash.2002); *Linda W. v. Indiana Dept. of Educ.,* 927 F.Supp. 303, 307 (N.D.Ind.1996), aff'd at 200 F.3d 504 (7th Cir.1999); Defs.' Mot. at 16; Pl.'s Opp' n at 9.

the relevance of intent and voluntariness." (internal citations and quotations omitted)).[10]

Hester's presence in Maryland was involuntary, and the Defendants do not dispute that he intends to return to the District of Columbia upon his release from MCTC. April 22, 2005 Hester Aff. As such, Hester's residence at all times he was incarcerated at MCTC was in the District of Columbia, not Maryland.

Because the Hearing Officer erroneously concluded that Hester had lost his residence in D.C., he did not address the issue of whether Defendants complied with the 2001 Consent Order and HOD which, as noted above, provided that compensatory education was to be provided from November 1, 2000, until the day before which Hester began receiving educational benefit through CLC.

There is no evidence in the record to suggest, and Defendants do not argue, that Hester was receiving any educational services from November 1, 2000 until the MCTC IEP team's first meeting on July

17, 2001. Although Defendants do argue that Hester did eventually receive educational benefit while at MCTC, the 2001 Consent Order and HOD specifically required that such benefit be provided by CLC, not the MCTC IEP team or Maryland's Department of Education.[11] AR at 65. Thus, because the explicit terms of the 2001 Consent Order and HOD were not complied with, Hester's rights to compensatory education from CLC continued to accrue during the entire time he was incarcerated at MCTC. Therefore, compensatory education must be provided by CLC for the period November 1, 2000, through August 5, 2005,[12] and the "form and quantity of compensatory education" is to be determined by Hester's District of Columbia IEP team. *Id.*

In determining the form and quantity of compensatory education owed to Hester, the District of Columbia IEP team should consider the educational benefit, if any, which was provided to Hester during his incarceration in Maryland. As the Hearing Officer noted [13]:

10. In applying this general legal principle to the election context, the court in *Lawrence* relied on the specific statutory definitions in D.C.Code § 1–1001.02(16)(A) (defining residence for voting within the District of Columbia as "the principal or primary home or place of abode of a person. Principal or primary home or place of abode is that home or place in which the person's habitation is fixed and to which a person, whenever he or she is absent, has the present intention of returning after a departure or absence therefrom, regardless of the duration of the absence."), and D.C.Code § 1–1001.02(16)(E) ("No person shall be deemed to have gained or lost residence by reason of absence while . . . kept at any institution at public expense, or while absent from the District with the intent to have the District remain his or her residence."). While these statutory definitions are directed to voting issues, they "provide [ ] a helpful and relevant gloss within which to interpret the meaning of 'residence' under D.C. law." *Lawrence*, 611 A.2d at 533.

11. It is true that the parties' agreement preceding the Consent Order did not include the fact that CLC would be the provider of educational services. That is of no moment, however. By failing to appeal the 2001 Consent Order and HOD, which did specify that CLC would be the provider of educational services, Defendants are bound by its specific terms, including those which may not have been included in the prior agreement.

12. Hester turned 22 years old on this date. Pl.'s Proposed Order to Motion for Summary Judgment.

13. The Hearing Officer also observed that he was "impressed with the student and his desire to seek appropriate educational opportunities. It may be the subject of debate as to the actual benefit he is receiving, but apparently he has the desire and is progressing. In this regard, the Hearing Officer also recognizes the effort of his representatives who have continued to work with him for several

[T]here is a significant issue here with [sic] regarding whether the student is receiving educational benefit while being in [sic] incarcerated. Based on this Hearing Officer's review of the record in particular the IEP's and meeting notes, the testimony of the student, as well as Ms. Felton, the student has made progress, but just not as much as he perhaps could have made. However, in view of the student's situation, this is understandable.

AR at 10.

Indeed, the facts regarding whether Hester received any educational benefit while at MCTC, after the MCTC IEP team was involved, are sharply disputed. For example, at the due process hearing in 2004, Patricia Felton, co-founder of CLC, testified that "based on her review of documents that were provided to her by MCTC regarding the student, the services as set forth in the DCPS IEP dated May 10, 2000 had not been implemented and that the student was receiving less services." AR at 5. She further testified that "one particular concern was the lack of career training for the student that was a part of the DCPS IEP, but not the MCTC IEP." *Id.* at 6. Moreover, "she did not believe that the student was receiving an individualized program, but more of a group standardized approach." *Id.* Nobody testified on behalf of the District of Columbia as to whether the services provided to Hester while he was at MCTC were sufficient to comply with the 2001 Consent Order and HOD.

Felton also testified that the testing method used to monitor Hester's academic progress, the Test of Adult Basic Education ("TABE"), is known to be inaccurate and unreliable. AR, Due Process Hr. Tr. at 40. Moreover, the tests do not even

establish that Hester was benefitting from his education at MCTC. When he began at MCTC in 2001, he was performing at a 5.5 grade level in math and a 6.5 grade level in language; his most recent test scores indicate that he is performing at the 5.3 grade level in math and a 2.9 grade level in language. AR at 114. Thus, his scores have dropped significantly.

Plaintiffs further allege that between 2001 and 2003, there was a significant decline in the number of hours of special education Hester received, without any explanation for the variation. AR at 111, 123. The November 13, 2001 IEP indicated that Hester was entitled to ten hours of special education per week and nineteen and a half hours of regular education per week. *Id.* at 99. The November 13, 2002 and October 30, 2003 IEPs, however, provide for only five hours of special education per week and ten hours of regular education per week. *Id.* at 111, 123.

Finally, Hester provided an affidavit stating that he had been in segregation for at least 90 days during the time his 2002 and 2003 IEPs were in place. During that time, he received only two hours of special education per week (instead of five) and no general or vocational training at all. *Id.* at 103, 118; Apr. 22, 2005 Hester Aff. Hester further stated that he misses "about 9 or 10 class [sic] per month because my teachs [sic] don't show up." Apr. 22, 2005 Hester Aff.

Defendants fail to explain these facts, which all tend to show that Hester has received limited educational benefit while at MCTC. Therefore, the District of Columbia IEP team will have to carefully consider the record in this case in making its determination as to the "form and quantity" of compensatory education to which Hester is entitled.

years to ensure he is getting an edu- cation/training." AR at 10.

## IV. Conclusion

For the reasons set forth above, Plaintiff's Motion for Summary Judgment, [# 14], is **granted,** and Defendants' Motion for Summary Judgment, [# 16], is **denied.** An Order will issue with this Memorandum Opinion.

### *ORDER*

Plaintiff, Antonio Hester, brings this suit alleging that Defendants, the District of Columbia and Robert C. Rice, Superintendent of the District of Columbia Public Schools, failed to provide him with a free appropriate public education ("FAPE") as required under the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. §§ 14, et *seq.* This matter is before the Court on Plaintiff's Motion for Summary Judgment, [# 14], and Defendants' Cross–Motion for Summary Judgment, [# 16]. Upon consideration of the Motions, Oppositions, and Replies, and the entire record herein, and for the reasons stated in the Memorandum Opinion, it is hereby

**ORDERED** that Plaintiff's Motion, [# 14], is granted; and it is further

**ORDERED** that Defendants are required to provide Plaintiff with compensatory education, provided for by Certified Learning Center ("CLC"), for the period from November 1, 2000, through August 5, 2005; it is further

**ORDERED** that the amount and form of the compensatory education shall be determined by Plaintiff's District of Columbia IEP team; and it is further

**ORDERED** that Defendants' Motion, [# 16], is **denied.**